## TERRITORY *v.* NICHOLS.

January Term, 1884.

1. CRIMINAL LAW—VERDICT ON SUNDAY.
   A verdict is not vitiated by the fact that it was returned on Sunday.
2. SEPARATION OF JURY.
   The unauthorized separation of the jury in a capital case, after a verdict has been reached, written out, signed by each juror, and sealed up, though gravely reprehensible, will not avoid the verdict, where there was no actual abuse, and the defendant was not prejudiced.[1]
3. SAME—INSTRUCTIONS—DEGREES OF CRIME.
   The court must submit to the jury the consideration of every degree of the crime charged which the evidence tends to prove, and the exclusion of any grade is error, whether asked for by counsel or not, and warrants a reversal of the judgment.

Appeal from First district.

---

[1] It is within the sound discretion of the court to permit the jury to separate. Territory v. Chenowith, (N. M.) 5 Pac. Rep. 532. Separation was held harmless in Boyett v. State, (Tex.) 9 S. W. Rep. 275; Cooper v. State, (Ind.) 22 N. E. Rep. 320; State v. Washburn, (Mo.) 4 S. W. Rep. 274.

*William Breeden,* Atty. Gen., for appellee.

*W. D. Lee,* for appellant.

BELL, J. The prisoner was indicted for murder in the first degree at the September term of the district court for the county of Colfax. Thereafter, at the same term of the said court he was tried upon this indictment, and convicted of the offense of murder in the second degree and sentenced to imprisonment for life. From this judgment thus pronounced against him he has appealed to this court. Various errors are assigned upon the record before us, which we will consider in their order. The first is, that the verdict in this case was returned on Sunday, and is therefore a nullity. Authorities are cited to sustain this view, and some of them do so, but a careful review of the modern decisions leads us to the conclusion that the common-law rule has been so modified in most of the states as to make it proper to receive a verdict on Sunday, though perhaps not to pronounce a judgment thereon. The distinction is made by many of the decisions between acts judicial and ministerial, and it is held that the receiving of a verdict is ministerial, or, at most, only *quasi* judicial. It may be done when no strictly judicial act can be; as, "though Sunday is *dies non juridicus,* wherein no judicial act is valid, but ministerial acts are, a verdict received on Sunday is good, yet not a judgment on the verdict." 1 Bish. Crim. Proc. § 1001, and numerous cases cited; *Hoghtaling* v. *Osborn,* 15 Johns. 119; *Baxter* v. *People,* 3 Gilman, 385. The reason assigned by some of the judges against the propriety of receiving a verdict on Sunday is, in substance, that it is a desecration of the Sabbath day; that, in the language of the supreme court of Iowa, "courts of justice should, at least, by their practice and decisions, maintain the sanctity of that time-honored and heaven-appointed institution." We cannot see the force or good sense of such reasoning. Is it to be said that the sancity of the day is violated by discharging from unnecessary confinement 12 citizens who have completed important and honorable service for the state? Is it desecration to permit them to return to their homes and join with their families in such observation of the day as may seem good to their consciences? We think not; and are therefore clearly of the opinion that the return of the verdict in this case on Sunday was proper.

The common-sense view of this subject is so well presented in a New Jersey case that we quote from it: "Although it is the solemn duty both of courts and juries so to arrange their business and so to discharge their duties as never to encroach in the smallest degree on the Sabbath, if it be possible to avoid it, yet when the jury have been compelled to reach the morning of that day before the verdict was prepared, I see no mode of proceeding so proper as to receive the verdict, dismiss the jury and parties, and at such future day

as may be convenient and proper take the subsequent proceedings. This must be done *ex necessitate rei.*" *Van Riper* v. *Van Riper*, (4 N. J. Law,) 1 South. 156.

The second alleged error is upon the refusal of the court below to set aside the verdict of the jury for the reason, that, after being sent out to deliberate upon their verdict, the jury, without the permission of the court, separated, and mingled with the people, and afterwards returned a sealed verdict. This was a grave irregularity and merited severe reprehension from the court. It is quite probable that the jurors themselves may not have been aware of the serious consequences which might flow from the act of separation, but it would seem almost impossible that the officers having them in charge could have furnished any good excuse for their neglect of duty; they were sworn to keep the jurors together, and should have been held to strict responsibility for their failure to do so. We do not think, however, that the court below erred in refusing to set the verdict aside in the case at bar for the reason assigned. From the record it appears that the jury agreed upon their verdict at about 4 o'clock in the morning; that they wrote it out, and each juror signed it, and that the written verdict thus signed was placed in an envelope, sealed, and taken in charge by the foreman of the jury; that the jurors then separated and reassembled at the court house at about 8 o'clock of the same morning, and then returned their verdict to the court convened for that purpose. The following also appears in the bill of exceptions as returned: "It is not claimed that the verdict was in any way changed after the jury separated, but it is agreed that the verdict which they agreed to, signed, sealed up in an envelope, and delivered to their foreman, is the same verdict upon which they were polled." However reprehensible the unauthorized separation of the jury may have been, we think the record shows clearly that no prejudice to the prisoner came from it. The best authorities on the subject now hold that when the separation was under such circumstances as that there was no reasonable ground to believe that any abuse followed, a verdict will not be disturbed. In regard to irregularities on the part of a juror or the panel, Bishop says: "The doctrine * * * is that if the defendant has been deprived of a substantial right, or if he has suffered injury or been put in danger of suffering it from an irregularity, and has been convicted, the verdict will be set aside; otherwise not." 1 Bish. Crim. Proc. § 999, and cases cited.

The supreme court of New York, in an elaborate discussion of this question, says: "Anciently, the utmost rigor and strictness was observed in keeping the jury together, and when once charged with a cause, they never could be discharged till they had agreed upon their verdict; but the practice has been much relaxed in modern times in both these particulars. On looking into the books we do not find that a mere separation of the jury has ever been held a sufficient cause for

setting aside a verdict, either in a civil or criminal cause, if we except, perhaps, the case of *Com.* v. *McCaul,* 1 Va. Cas. 271. We think that the mere fact of separation, unaccompanied with abuse, should not avoid the verdict, even in a capital case. We do mean to be understood as saying that the mere separation of the jury without any further abuse is not sufficient ground for setting aside a verdict, though it may deserve severe reprehension from the court." *People* v. *Douglass,* 4 Cow. 26; *People* v. *Ransom,* 7 Wend. 423.

In another case in the same state, Judge SELDEN says: "In New York mere separation (of the jurors) without permission appears formerly to have been *prima facie* evidence of misbehavior, but the better opinion now is that to vitiate a verdict reasonable suspicion of abuse must exist." *Eastwood* v. *People,* 3 Parker, Crim. R. 44.

The reasoning in the cases cited seems to us to express the correct view of the law. In the case at bar, the record, as we have said, shows clearly that no abuse followed the unauthorized separation of the jury, and there is not left even a suspicion that the defendant was thereby prejudiced. We are therefore of the opinion that the court below correctly refused to set the verdict aside on account of this irregularity.

The next point made by counsel for the appellant is that "the evidence in this case is of such a nature that the jury might have found the defendant guilty of murder in the fourth degree, and it was error in the court in not instructing as to murder in the fourth degree." By the bill of exceptions certified to this court, it appears that "said judge who presided at said trial instructed the jury impaneled to try said case only in relation to murder in the first degree and murder in the second degree; and the said defendant did not, either personally or by his counsel, ask for instructions in any other degree or degrees of murder." It is, we think, so well settled as to become almost elementary law that the court in its instructions to the jury in a criminal case must give to them all the law applicable to the evidence elicited at the trial. This, indeed, is the very purpose of instructions from the court, and it is only properly fulfilled when the jury retire to their room fully informed of the principles of law which is to govern them in considering the testimony. The law makes this the duty of the presiding judge, and he must perform it whether requested to do so or not. Suppose the evidence in a capital case clearly pointed to a particular degree of the crime as defined by the statute, and the presiding judge failed, through inadvertency or otherwise, to charge as to that degree, and the defendant was thereby prejudiced, can it be said that because his counsel did not ask for instructions as to that particular degree, that he cannot avail himself of the error in the appellate court? We think not; and as we have said already, we think the law on this subject is well settled. Bishop, in his work on Criminal Procedure, says:

"The charge should state the law in its application to the facts, as

already explained, correctly and fully. If, for example, there are different degrees of an offense, the law of each degree, which the evidence tends to prove, should be given, but not of any degree which it does not tend to prove." 1 Bisn. Crim. Proc. § 980, and numerous cases cited.

Another writer says: "As to the grade or character of the offense, it is the duty of the court to define, in all its elements, the offense charged; to point out what constitute the different grades of the offense charged in an indictment, as in the case of homicide." Proffatt on Jury Trial, section 328. Wharton, on this subject, says: "The law is to come from the court, and the court is bound to give the law; and it has been repeatedly declared that the defendant has a right to a full statement of the law from the court, and that a neglect to give such full statement, when the jury consequently fall into error, is sufficient reason for reversal." Whart. Crim. Pl. & Pr. § 709. "It is error for the judge, unless there be an entire absence of evidence to prove a particular grade of murder, to exclude such grade from the consideration of the jury." Id. § 713; *McNevins* v. *People*, 61 Barb. 307; *Adams* v. *State*, 29 Ohio St. 412.

We have quoted thus far from the text-writers; but the law is made clear in this territory not only by the statute but by several adjudications. The practice act of 1880, section 23, provides, among other things, that "the court shall instruct the jury as to the law of the case, but shall not comment on the weight of evidence." Prince's Comp. 126. This statute of course can only mean that the court shall instruct the jury as to all the law applicable to the evidence in the case, and this being so, a failure to do so would be error. The court is not permitted to wait until it is asked to charge as to a particular degree of crime to which the evidence is applicable, but it must do so as a part of its duty in the case. The question has, however, been passed upon in this court. In *Territory* v. *Young*, this court said: "Of course, the judge who thus excludes certain degrees from the consideration of the jury, does so at his peril; that is to say, he should be absolutely certain in that there is no testimony whatever which would make a verdict of one of these degrees possible, for if there is the least evidence, it is for the jury to determine its weight and effect. And the slightest mistake of that kind would be error for which the appellate court would have to grant a new trial." 2 N. M. 93. In another case, at the same term, this court said, in considering the same question in a capital case: "If there is any evidence whatever which could bring the case within the definition of any degree not given, the limitation of the degree in the charge to the jury would be error which would be good cause for reversal." *Territory* v. *Romine*, 2 N. M. 114. See, also, *Territory* v. *Romero*, 2 N. M. 474.

Did the court below err in its instructions to the jury in this case? The evidence on both sides was to the effect that the prisoner, the deceased, and two other persons were seated at a table playing cards

together; that the prisoner charged the deceased with cheating, and then jumped up and either drew a pistol or tried to do so, when the deceased clinched with him and both fell to the floor, the deceased being on the top; one of the other players took prisoner's pistol away from him; that then he and the deceased got up, and that after getting up the prisoner stepped about four feet to where his overcoat was, drew from it another pistol and immediately fired at deceased. One witness says that three or four minutes elapsed between the scuffle on the floor and the firing, but it is apparent from all the evidence that the events of the strife followed in rapid succession until it culminated in the death of one of the parties.    The testimony of the several witnesses to the occurrence, called by both the prosecution and defense, varies but little from the above statement of the evidence. The court, upon this state of proof, charged as to the degrees of murder as follows: "If he (prisoner) premeditated the death of deceased, it is murder in the first degree, and the punishment is death.    If he killed him upon a sudden impulse, and in great heat of passion, but under circumstances which showed an abandoned mind, regardless of human life, he is guilty of murder in the second degree."

No other degree of the crime of murder was given to the jury.    Passing over the first degree of the crime as given by the court, and which it is unnecessary to consider, as the prisoner was not convicted of it, we think the court below erred in its definition of the second degree of murder, and to the prejudice of the prisoner.    Correctly defined, under our law, murder in the second degree consists of "the killing of a human life, being without authority of law,    *    *    *    when perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.    *    *    *" The killing in the case at bar was not such a killing as is contemplated by this defined degree of murder.    This statute does not contemplate a homicide committed "upon a sudden impulse and great heat of passion," as stated by the presiding judge in his charge in the court below, but a killing perpetrated by an act imminently dangerous to others, and without design to effect the death of any particular person, and evincing a reckless disregard of human life, such as recklessly firing a pistol into a crowd, or casting a stone from the top of a house into a crowded street without thought or regard of the consequences of such acts, or as to who should be injured or killed thereby. The prisoner in this case, upon all the evidence, either unlawfully killed the deceased from a premeditated design to effect his death, in which case he should have been convicted of murder in the first degree, or he killed the deceased under circumstances which would have warranted his conviction of the crime of murder in the fourth degree as defined in our law.    One of those definitions is: "The killing of another in the heat of passion without design to effect death, by a dangerous weapon.    *    *    *"

v.3 N.M.—6

We are of the opinion that upon the evidence the court below erred in not defining to the jury this degree of murder. The prisoner and deceased had a fight, and the jury might very well have found on the evidence that, in the heat of passion consequent on it, and immediately following it, the prisoner fired the shots which caused his death, but without design to effect it. All the evidence shows that the prisoner fired the shots, and fired them at deceased, either with design to effect his death or without that design. There can be no question but that the shots were intended for the deceased, and him alone, and so the case could not be one of murder in the second degree. The prisoner was, upon the evidence, improperly convicted of that degree of crime, and we think that this resulted from the erroneous definition of that offense given by the presiding judge in the court below, and from his failure to submit to the jury the definition of murder in the fourth degree as being applicable to the evidence in the cause.

The judgment must be reversed and a new trial ordered.

BRISTOL, J.   I concur.